UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE No. 8:12-CR-486-T-26TGW

JOSE LUIS PANAMENO-CHAVARRIA
_____

ORDER

THIS CAUSE came on to be heard upon the Government's Ex Parte Notice to the Court Reference Perceived Conflict of Interest Representation (Doc. S-3). The Government presents information which indicates that the defendant's legal fees were paid by the co-defendant, or another member of a drug trafficking organization. A hearing on this matter confirms that assertion.

Because the institutional interest in the administration of justice and the integrity of the court is impeded by this circumstance, I disqualified attorney George J. Vila, and his local counsel, Nicholas G. Matassini, from representing the defendant in this matter and appointed the Federal Public

Defender's Office as defense counsel. This Order explains the reasons for my decision.

I.

It is alleged in the superseding indictment that defendant Jose Luis Panameno-Chavarria ("the defendant") and co-defendant Yosvany Cabrera willfully conspired with each other, and other persons, to manufacture one hundred or more marijuana plants, and that they knowingly and willfully manufactured and possessed, with the intent to distribute, one hundred or more marijuana plants, in violation of 21 U.S.C. 846 and 841(b)(1)(B)(vii) (Doc. 26). The defendant is also alleged to have possessed a firearm in furtherance of the drug trafficking crime in violation of 18 U.S.C. 924(c) (id., p. 2). If convicted of these charges, the defendant could face minimum mandatory sentences totaling 15 years.[1]

The charges arose after law enforcement arrived at a residence at 3220 Bruton Road in Plant City on September 8, 2012, in response to a 911

---

[1] At present, the defendant is facing two consecutive minimum mandatory sentences of five years. At the hearing, the Government represented that it is considering filing a notice of enhancement pursuant to 21 U.S.C. 851, which would increase the minimum mandatory sentence on the drug charges to ten years.

emergency call placed by the defendant's neighbor stating that the defendant had been shot (see Docs. 17, 18). Law enforcement discovered inside the house, and in a barn outside the house, a marijuana grow operation (Doc. 17, p. 2; Doc. 18, p. 2). In a sworn statement given by the defendant to law enforcement, the defendant stated that he had been living in the home and growing marijuana plants there (see Doc. 18-2, pp. 12, 13, 15, 17). The defendant stated that the owner of the home, Giovanni Cabrera, was aware that marijuana was planted on the property (see id., pp. 15, 16).

When the defendant was arrested on these federal charges in December 2012, private counsel Matassini entered an appearance on the defendant's behalf (Doc. 6). The following month, attorney Vila, who was also privately retained, entered an appearance in this case as counsel for the defendant (Doc. 15).

On or about February 22, 2013, the Government submitted an Ex Parte Notice to the Court Reference Perceived Conflict of Interest Representation (Doc. S-3). The Government discussed in the Notice information that created concerns "as to whether [the defendant] ... is receiving conflict free representation" (id., pp. 3-4).

Specifically, on October 12, 2012, Jessica Alvarado, the defendant's niece, contacted the Hillsborough County Sheriff's Office (HCSO) regarding her uncle (id., pp. 1-2).[2] Alvarado told an HCSO detective (id., p. 2):

> [T]he defendant came to Florida approximately four years ago when he was offered work to take care of a farm. [Alvarado] said that, at the beginning, she used to have contact with her uncle by phone, but that in 2009 her uncle told her that the residence on the farm was a marijuana grow house operation. He told her that if something ever happened to him that she needed to know the truth. She said that the defendant told her that he had signed a lease for the property from El Gordo, a nickname for Yosvany [the co-defendant in this case]. He told her that if he was ever caught in the house with the marijuana plants that he was supposed to take the blame and Yosvany, the owner of the house, would hire an attorney for him and pay his bond.

Furthermore, in a letter the defendant sent to his wife from jail in November 2012, the defendant stated (Doc. S-3, Ex. 2) (translated from Spanish to English, emphasis omitted):

---

[2] In September 2012, prior to the federal indictment, the defendant was charged in state court with drug and other criminal offenses.

-4-

> You know that that friend owes me twenty thousand and he has to send it all to you. So you have to tell him to send you at least $3000 a month .... That is what he owes me and if in seven months I haven't been released he still has to send it to you monthly in order for not divulging him. In other words, not to talk .... That is why I am more valuable in prison for him because he knows if he fails me I will sing and that won't be good for him. He knows that this is why I'm relaxed and calm and not talking. He knows that's how it is.

Additionally, Government counsel, who is fluent in Spanish, reviewed jail telephone calls between the defendant and his wife (id., pp. 2-3). During one such conversation, as summarized by the prosecutor, the defendant stated in response to his wife's inquiry whether his attorneys have visited him (id., p. 3):

> [H]e is bummed ... because they haven't gone to see him. He says he doesn't know what is going on and that he really needs to talk to them before the trial, which is in about 15 days. He goes on to say that maybe they are waiting for some kind of negotiation or offer before the trial. He tells his wife that the government has to make him an offer in order to avoid trial so maybe that is what his lawyers are waiting for before they go to see him.

In another intercepted telephone call, the defendant similarly tells his wife that "he is waiting for his lawyers to bring him an offer or deal from the

prosecutor in order to avoid a trial" (id.). Government counsel stated that these comments caught her attention because "defense counsel have never asked the undersigned for a plea agreement or discussed a possible resolution of the case in lieu of a trial. In fact, defense counsel's position has always been from the very outset of this case that the defendant has always intended to go to trial" (id.).

Copies of the Government's submission were provided to defense counsel. At the request of District Judge Richard A. Lazzara, a hearing was held on March 5, 2013, to determine whether the defendant is receiving conflict free representation (see Doc. S-4).

At the hearing, Assistant United States Attorney Maria Chapa Lopez appeared on behalf of the Government. The defendant was present with his counsel, Vila and Matassini. A Spanish interpreter translated the proceedings for the defendant. Also present at the hearing was attorney Frank de la Grana, who, at Vila's request, interviewed the defendant regarding the alleged conflict, and was willing to testify regarding his conversation with the defendant.

Initially, I asked the Government if any additional information pertinent to this matter had been discovered, to which Chapa Lopez responded that she had listened to additional jail telephone calls between the defendant and his wife, and during one of those calls, the defendant reiterated that he was hoping for a plea agreement.

Defense counsel Vila then answered questions, although not under oath. I asked Vila who was paying the defendant's attorneys' fee. After rejecting Vila's request to answer this question *ex parte*, Vila responded that the money was from a third party, but that he had "no idea" who the money came from.

Vila then stated, vaguely, that he previously met with the defendant's "friends" in Miami, and discussed with them the defendant's case and his attorney's fee. Vila said that "someone" subsequently showed up at his office, when Vila was not there, and "basically dropped off the money" with his secretary.

Vila subsequently said that he could try to find out from the defendant's family who paid the attorneys' fee. In this regard, Vila said that the family lives in Honduras and is in the "agricultural" business. Chapa

Lopez added that the defendant's jail telephone calls suggest that the family is merely trying to make ends meet financially, and there is certainly no indication that they have the financial means to pay the defendant's attorneys' fee.

It was clear to me at the close of the hearing that disqualification was warranted, and I was extremely dubious that contact with the defendant's family would reveal information regarding the source of the funds for the attorneys' fee. I therefore saw no reason to delay the appointment of conflict-free counsel. Consequently, based on the information before me, I disqualified defense counsel from representing the defendant in this matter and appointed the Federal Public Defender to represent the defendant.

II.

It is recognized that "a criminal defendant has a presumptive right to counsel of choice ... and courts should hesitate to disqualify defense counsel." United States v. Ross, 33 F.3d 1507, 1522-23 (11th Cir. 1994), cert. denied, 515 U.S. 1132 (1992)(citation omitted). Thus, the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence," and the

accused's ability to select the counsel of his choice is considered part of that right. Id. at 1522 (citing Powell v. Alabama, 287 U.S. 45, 53 (1932)).

However, that right is not absolute, and the presumption in favor of the accused's chosen counsel "may be overcome ... by a demonstration of actual conflict ... [or] a serious potential for conflict." Wheat v. United States, 486 U.S. 153, 164 (1988). Thus, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Id. at 159.

Furthermore, "[t]he question of disqualification...implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." United States v. Locascio, 6 F.3d 924, 931 (2nd Cir. 1993), cert. denied, 511 U.S. 1070 (1994). Consequently, although a criminal defendant can proffer a waiver of his Sixth Amendment right to conflict-free counsel, a court may reject that waiver if necessary to "ensur[e] that criminal trials are conducted within the ethical standards of the

profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, supra, 486 U.S. at 162; see also United States v. Ross, supra, 33 F.3d at 1523.

### III.

The only reasonable inference from the information presented at the hearing is that a member of a drug trafficking organization is paying the defendant's legal fees. In this regard, the Government recounted a conversation between the defendant's niece and an HCSO detective in October 2012, in which the niece told the detective that her uncle revealed to her in 2009 that he was growing marijuana plants on property rented from "El Gordo" (the nickname of the co-defendant in this case), and that her uncle had a deal with the co-defendant that, if the uncle got caught, the co-defendant would pay his attorney's fee and his bond in exchange for taking the blame for the marijuana grow operation (Doc. S-3, p. 2). Significantly, there is no basis to conclude that this information is unreliable. Furthermore, the defendant stated in a letter sent to his wife from the jail that his "friend" owes him money "not to talk" (id., Ex. 2). This information further buttresses the

conclusion that someone in the drug trafficking operation is funding the defendant to keep him from cooperating with the Government.

Further, defense counsel's response to my inquiry regarding who paid the defendant's attorneys' fee confirmed the suspicious nature of this payment. Thus, Vila stated that he has "no idea" who paid the defendant's attorneys' fee; he said that someone simply showed up at his office, when he was not there, and dropped off the money with his secretary. Vila had nothing more to say about the circumstances surrounding the payment of the defendant's attorneys' fee other than to state that he had met previously with unidentified "friends" of the defendant, and discussed the defendant's case and his attorney's fee with them.

The notion that an unidentified legitimate source dropped off a pile of money at Vila's office to pay for the defendant's attorneys' fee is implausible. Furthermore, there is no indication that either the defendant, who came to the United States illegally to work on a farm, or his family, who live in Honduras, had the resources to pay for his counsel. Consequently, particularly in the absence of any other explanation, the obvious, and only

conclusion that someone in the drug trafficking operation is funding the defendant to keep him from cooperating with the Government.

Further, defense counsel's response to my inquiry regarding who paid the defendant's attorneys' fee confirmed the suspicious nature of this payment. Thus, Vila stated that he has "no idea" who paid the defendant's attorneys' fee; he said that someone simply showed up at his office, when he was not there, and dropped off the money with his secretary. Vila had nothing more to say about the circumstances surrounding the payment of the defendant's attorneys' fee other than to state that he had met previously with unidentified "friends" of the defendant, and discussed the defendant's case and his attorney's fee with them.

The notion that an unidentified legitimate source dropped off a pile of money at Vila's office to pay for the defendant's attorneys' fee is implausible. Furthermore, there is no indication that either the defendant, who came to the United States illegally to work on a farm, or his family, who live in Honduras, had the resources to pay for his counsel. Consequently, particularly in the absence of any other explanation, the obvious, and only

reasonable, conclusion is that the defendant's attorneys' fee is being paid by the co-defendant or some other member of a drug organization.

The impropriety, and the risk of conflict, created by a drug organization paying the defendant's legal fees is clear. Thus, the Supreme Court recognized in Wood v. Georgia, 450 U.S. 261, 268-69 (1981):

> [I]nherent dangers ... arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against [the alleged criminal enterprise] or from taking other actions contrary to the [enterprise's] interests.

Such a conflict of interest is not hypothetical in this case. Thus, the defendant told his wife that his "friend" owes him $20,000 for "not divulging him. In other words, not to talk" (Doc. S-3, Ex. 1). Further, the defendant told his niece that he had a deal with the co-defendant that, if he got caught, the co-defendant would pay his attorneys' fee and his bond in exchange for taking the blame for the marijuana grow operation (id., p. 2). Thus, the drug organization has an apparent strong desire that the defendant not cooperate with the Government so that he does not implicate anyone else

in the illegal drug activity. That desire, however, obviously conflicts with the defendant's interests.

Thus, if convicted, the defendant could face minimum mandatory prison sentences totaling 15 years. Further, there is overwhelming evidence that the defendant was engaging in the drug trafficking activity with which he is charged. In fact, the defendant admitted in a sworn statement to an HCSO detective that he was growing marijuana plants at the marijuana grow house where he resided, and transporting the marijuana in a truck (see Doc. 18-2, pp. 13, 15, 16). Under these circumstances, it is clearly in the defendant's interest to seek to obtain a beneficial plea agreement.

Significantly, the defendant said during telephone conversations with his wife that he desired a resolution of this case without a trial. In particular, he expressed to his wife disappointment that his counsel has not discussed with him a plea offer, and the defendant speculates that his attorney is "maybe ... waiting for some kind of negotiation or offer before the trial" (Doc. S-3, p. 3).

However, for unknown reasons, Vila has not discussed with the Government the possibility of a plea agreement. Chapa Lopez indicated that

she was surprised to hear the defendant express in telephone conversations his desire for a plea agreement "because defense counsel have never asked the undersigned for a plea agreement or discussed a possible resolution of the case in lieu of a trial. In fact, defense counsel's position has always been from the very outset of this case that the defendant has always intended to go to trial" (id.). Under these circumstances, the public perception from the way that this matter is being handled is that there is an injustice being done to the defendant and the court is being tricked into participating in that injustice.

In this regard, it is acknowledged that the defendant is apparently willing to waive his Sixth Amendment right to conflict-free counsel. However, because the court also has an institutional interest in the administration of justice, this matter cannot simply be ignored by the defendant's waiver of a conflict.

Thus, a trial court may refuse to accept the waiver in order to ensure the proper administration of justice and maintain the integrity of the court. See, e.g., Wheat v. United States, supra, 486 U.S. at 160; United States v. Ross, supra, 33 F.3d at 1524. As the Supreme Court articulated in Wheat v. United States, supra:

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by [conflicted] representation.

In particular, the court explained in Quintero v. United States, 33 F.3d 1133, 1136 n. 3 (9th Cir. 1994):

> If in fact [defense] counsel was paid by a drug supplier to assure that the supplier would evade prosecution, the injustice is manifest. Not only w[ould] the [defendant be] deprived of an attorney whose allegiance was solely to him, but, just as important, the court [would] be[] prevented by trickery from making certain that justice was accomplished. Justice and the Constitution cannot permit such a fraud upon the court or the litigants before it.

Under the circumstances, I did not even address a waiver of conflict-free counsel in this case.

Therefore, even though I assume the defendant is willing to waive his right to conflict-free representation, in order to ensure that these legal proceedings are conducted within the ethical standards of the profession, and to preserve the integrity of the court, Vila (and local counsel

Matassini) were disqualified from representing the defendant. See Wheat v. United States, supra; United States v. Ross, supra, 33 F.3d at 1524.

 IT IS SO ORDERED.

 DONE AND ORDERED at Tampa, Florida, this 8th day of March, 2013.

/s/ Thomas B. Wilson
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE